for argument is United States v. Kendall, docket 19-1465. Mr. Sheehan, please proceed when you're ready. Thank you and good morning. May it please the court and opposing counsel, my name is Michael Sheehan. I'm arguing this case on behalf of the defendant appellant Aaron Kendall. Mr. Kendall is appealing the district court order denying his motion to suppress. He has two bases for making that argument. The first is that the search was unconstitutional to begin with. The second is that assuming arguendo that the search was constitutional, the officer's actions during the search exceeded the permissible bounds of a constitutional inventory search. So what I'd like to do is begin by talking about the basis to begin the search in the first place and then second move into the arguments connected to this second issue that has to do with whether the officer's actions exceeded the bounds of a constitutionally permissible inventory search. Let me before you go there ask you just a simple question on the facts. Was the gun holster visible from outside of the automobile and if so, before we ever got to searching, did an officer see the gun holster? Your honor, the gun holster was visible only after an officer started the inventory search. So it was not visible to anybody that was just walking around the car and I think that's borne out in the video evidence that the court has had an into the car with a flashlight kind of looking around. At one point, one of the officers with Mr. Kendall's permission grabbed his cell phone off the front seat of the car, but no officer had seen the holster or anything like that until the first officer went into the car after they had decided to impound the vehicle and do an inventory search. So as a threshold matter, the car in this case was not impeding traffic or impairing public safety and I want to make clear that while in our opening brief, Mr. Kendall did call into question some of the standardized criteria that were used in this case, that's not the thrust of his argument. He's not trying to persuade this court to reverse the district court order based on any kind of violation when it comes the standardized criteria piece of the United States. Let me just make sure I understand that concession. Florida V Wells says that you have to be well regulated in order to allow this kind of a inventory search and you're saying that you aren't raising that issue now, you're conceding that one, you're focusing on other things. I'm focusing on other things, your honor. So that issue, even though it was in the brief, that issue is now off the table, is that correct? So we can move on to the other arguments you're raising? Yes. Okay, thank you. So what Mr. Kendall does want to focus on is the idea that there was no legitimate community caretaking rationale in this case, which is needed along with the standardized criteria to satisfy this court pursuant to United States v Sanders. The list of criteria from Sanders. I was just writing down a note from your concession. I didn't focus exactly on your last sentence. Would you just repeat it, please? Yes. So what I do want to focus on is my client's legitimate community caretaking rationale in this case, which is required along with the standardized criteria in order to satisfy this court pursuant to United States v Sanders. So how about at the point where they found the holster? Did there become a community caretaker rationale then your honor at the point where they found the holster? I don't believe that there was the idea that there was a crime committed. Just having a holster on your front seat doesn't amount to probable cause. Well, a passerby may see the holster and then break into the car trying to find the gun would be the rationale. Well, if the court is asking whether there's an officer safety concern. No, I'm asking community caretaker, which is obviously if there were a submachine gun on the dashboard, everyone would agree that there's a community caretaker rationale. If there's a firearm on the seat, I think the same. And if there's a holster on the seat, what about that? Your honor, I don't believe that just seeing a holster on a seat on the seat justifies this from a community caretaking standpoint, because if an officer sees that holster and uses the information that he now knows that there's a holster on the front seat of this vehicle and decides that there needs to be additional investigation, I think that's what this is. I think that falls into the suspicion that there's something else hidden in the car. What I'm really getting at is once they see the are they allowed to get into the loose panels looking for the firearm as community protection? Your honor, I don't believe that there's any case law support for that idea that an officer sees a holster and then makes the decision that on a community caretaking rationale, he can then take panels off of the interior of the vehicle. I know that at the trial court level, there was some suggestion that there was an officer safety justification for it. And there was some suggestion that perhaps it amounted to probable cause, but no argument at the trial court level or at the suppellant level that I've seen up to this point has been made that seeing an empty holster justifies taking the panels off of the... Let's add one other factor to Judge Phillips' situation. Let's add the fact that they followed him for seven or eight blocks before he stopped and they saw him take what appeared reasonably to be efforts to conceal things by moving back and forth into the car, moving his hands and so forth to the passenger section and so forth. So that they now had a second piece of information that he apparently reasonably could be construed to be concealing things. Your honor, I think that that evidence could be used to apply for a search warrant. For community care. So at that point, we all know, we've all seen plenty of cars on the sides of the road that if they're left there very long, they don't have any tires when you come back and they get the windows broken out to see if there's cell phones that are left in the console and so forth. So in any event, that has to all be plugged into the concern of community care, I suppose. But I was just going to add the additional thing about the fact they had seen him take evasive action. Your honor, I think that your honors could see from watching the video that there was high suspicion on the part of these officers when they finally got Mr. Kendall pulled over, they pulled him out at gunpoint, they handcuffed him and they put him into custody in the back of a police car. But from there, I think that that's, I guess I'll respond in two ways. I think that that could be plugged into this. This police officer and the other officers involved are investigating. They're always doing police work. They're never not paying attention to things like that. But the case law is pretty clear that when you talk about an impound and an inventory search, those are separate and distinct from the type of suspicions that these officers had when they were following him, when they pulled him over, when they saw the holster on the front seat of the car. All of those things have to do with, you know, police work, the types of things that these officers do every day. And if they decided that they wanted to pursue this type of a search and take apart the car because they believe there was probable cause to do that, or because they wanted to apply for a search warrant, there was nothing preventing them from doing that. But the basis that they gave for doing this search at the time was their community caretaking rationale pursuant to the inventory search. And that's the argument that was put forth by the government at the trial court level. It's the same argument that's being made here at the appellate level by the government. And I think that when this court looks at the non-exhaustive criteria that are listed in the Sanders case, I think that this does cut in Mr. Kendall's favor. The car was legally parked on a public property in a residential neighborhood. Not one car passed by the scene of this stop for the entire 45 minutes of that officer-worn body camera that the court was allowed to watch. So this was not a situation where this car was impeding traffic or cause impairing public safety in any way. An alternative to impound did exist. The car could have been towed. And I know that that doesn't, that there's no discussion of that between the officers and... If you tow a car, you still need to do at least an inventory search. I don't know what the law is on whether you might have a community function concern for a towed car. Does community care drop off the equation when it's towed or not? I believe it does, your honor. I think that if Mr. Kendall had the wherewithal or the resources at the time to ask to call a friend with a tow truck or call any of the towing companies in town, then he's taking this car off of the officer's hands. And there's no basis at all for the officers to do an inventory search because they're not doing the impound. In other words, Mr. Kendall's doing his own impound. Wasn't there a problem with that idea though, because he couldn't prove that he owned the car? It was registered to somebody else. It had a license plate that was purportedly for a different kind of car. He had no license. He had no registration. So how can they then trust him to have the car towed someplace else? I think that it is confusing because one of the first bases for the stop was that the license plate that was aired was not coming back to a Honda, which is what Mr. Kendall was driving. But that confusion about the license plate was cleared up soon after Mr. Kendall was stopped. But what wasn't cleared up is that Mr. Kendall was not to drive the car. He didn't have a valid license. He didn't have insurance. And you're correct, the car was not registered to him, but he was buying in the process of purchasing the car from a woman who we're calling CM in the briefs. There was a brief conversation with CM also at the scene. None of the officers proposed to CM or to Kendall or suggested to them that they had an opportunity to tow the car. I'm not necessarily saying that that's their obligation to do that. But I know that Mr. Kendall, as I said, did not at the time this was happening, have the wherewithal to start a conversation with the officers about that. So from Kendall's point of view, that particular piece of the Sanders criteria is a toss up. Yeah, I mean, even even if he could have done it, wouldn't it have been reasonable for them to not want to let him even if he said, hey, don't don't go through it. I'm just going to have it towed to my house. I mean, don't they have a reasonable position at that point to say, man, we're not letting you take this. You can't even prove you own it. I think, Your Honor, that that sort of is a good segue into another piece of this that's important for me to talk about, because it's it was a justification that was given at the trial court level and also a justification by the government in their answer brief. If an officer who suspects that the minute he turns his back, the suspect is just going to go on continuing crime or do something else unexpected, that's illegal. That's not a basis to justify an inventory search. That's a suspicion of criminal activity that hasn't occurred yet. And that's maybe the inception of an investigation into criminal activity that hasn't occurred yet. So it doesn't it can't be justified on inventory search or community caretaking grounds, which has been the justification all along by the government. So let me let me hypothesize something for you here. So what if I'm the owner of that car and he had, in fact, stolen it and the officers told him, go ahead and take it, even though they knew it wasn't registered to him and he could produce nothing that showed it was his. I mean, at that point, don't they face liability for me for letting him take my car a second time? Potentially in that hypothetical, your honor, but those are not the facts of this case. In the facts of this case, after a couple of attempts to speak with CM, the owner of the car, they were able to talk to her and she confirmed that she was in the process of selling the car to Kendall and that he was making payments and that she held the title of the car until he was finished making the payment. So so fair enough on that. But by the time they learned that information, it had already been inventoried and it was on the truck. That's correct, your honor. I mean, and that's I mean, one of the reasons why Kendall was arguing that this was pretextual in the first place. I mean, there was a whole lot that could have been done and should have been done prior to getting the vehicle on the tow truck. Thank you, counsel. Miss Malani. May it please the court. Elizabeth Ford Malani for the government. This court should affirm the denial of Mr. Kendall's motion to suppress because the seizure and then the search both complied with the Fourth Amendment. The way I understand Mr. Shan's arguments here today is that the policy requirements of both the seizure and of the search are not implicated in the that the officers follow the policies. So I'll direct my focus to the second prongs of each analysis. And I'll start with the community caretaking of the impound decision itself. Under these circumstances, we know from Sanders that there are several factors that the court can consider. And one of them is whether alternatives to impoundment exist. Here, there were no good alternatives to impoundment. The defendant was alone. He had no valid license. He had no proof of ownership or any sort of documentation connecting him to that car. So in that regard, it was unknown whether the defendant could have called a friend, for example, and ask them to pick up the car because there was no way to know whether he had the lawful authority to direct someone else to pick up that car. If defendant had been released at the scene and then allowed to drive the car away, I think that not only the illegal operation of the car would be issue, but also a hazard to the public. This person has no license and no insurance. So if there were some sort of accident, that would, of course, be a danger to the public, the lack of insurance, not to mention the taillight problem in this instance. And I will note that so when the officers called dispatch, the license plate came back as an Acura. And I'm not sure that I agree with my opposing counsel that this was entirely cleared up. At the suppression hearing, I don't recall much other testimony about this. And at minute 350 on the impoundment video, there's discussion about maybe maybe it had been called in wrong. Maybe it was a Honda Accord instead of an Acura. But I don't recall there being testimony clarifying that the officers were able to definitively confirm that. But even if they had confirmed that the license plate was proper, they still don't know if this defendant, if this person has any lawful authority to drive it or to direct what happens to it. And I think that that fact really undermines my opposing counsel's point that the defendant could have hired a tow truck to come get the car. Again, well, this defendant never did try to direct anything on that car, did he? At one point in the video, he asked if he could call a friend. Yeah, if you can call a friend, but he never he never said I'll take care of it with a tow truck or he basically what I understood was he just said we'll call the prior owner and you confirm that I haven't stolen the car. That's correct. That's my understanding as well. There's no indication on the dash cam video that he asks to hire a tow truck, for example, and take care of it himself. And even if he had that still present the same problem of releasing a car to the tow truck driver at the defendant's direction without even knowing whether or not the defendant has any say in that car, whether they can direct it to go anywhere. So I think that under these circumstances, the defendant just presented the officers with no good option, no good alternative. What about taking the car key and locking the car? So that wasn't discussed in the policy, Your Honor. So I think that that would be something that officers would be concerned with acting outside the policy. And also, I think that that the officers were getting off shift. Other officers were coming on shift. And I think that that poses its own obstacles. And I will note that while the factor itself asks whether there are alternatives to impoundment, I would direct back to Bertine, Colorado v. Bertine, which said that the reasonableness of a Fourth Amendment analysis does not necessarily turn on the least intrusive means. And that's why I come back to in this scenario, there weren't any prudent alternatives to impoundment. What was imprudent about Judge Phillips' suggestion? I think that the officers would have the possibility that defendant's property, if it was his property, could have been lost. It wasn't provided for in the policy. So perhaps the police officers were not set up to sort of operate in that way or to take that sort of scenario. It's really outside of the policy, isn't it? The policy doesn't say you can't do that. It's just a way that you don't have to activate the policy and start searching. So I don't know why the policy would prevent that. I'm not saying that it would prevent that, Your Honor. I'm just saying that in the absence of a directive to do that under the policy, I'm not sure how the officers could have been set up to do this. There was no testimony at the hearing. Opposing counsel didn't elicit any testimony at the hearing whether that could have been done. But even if it could have, I still think that the possibility of defendant's property being lost, misplaced, taking away his property, not knowing if it really belonged to CM, I think that these are all sort of concerns that would make the feasibility of that questionable. So would you just get the sequence for me? We've got the stop. We've got the observation of things in the guns. We've got the inventory search. We have the owner who called. We have it loaded on the tow truck. When did all this, I mean, what was the sequence? That is, when in this process did the officers actually do the community safety search? At what step? What had preceded exactly what had preceded their community safety search? So your honor, as you mentioned, there was the stop, the felony stop. Defendant was placed in the back of the patrol car with handcuffs. He was Mirandized. The officers asked him various questions. Where is this car from? Do you have a license? Things like that. There might have been a call to dispatch at that point. I don't entirely the registered owner. She didn't answer. Then they called from defendant's phone, did not answer. And I believe at that point is when the other two officers who had arrived to assist officer Rezac, when the officer Cotton started the inventory search. No, sorry. That was when everything was then discovered. Well, that was first, there was a $20 counterfeit bill found. And that's when the decision was made to remove defendant from the scene and when he would be taken to the police department. And then the search continued and when everything was discovered. But was defendant actually physically removed or was he still sitting in the backseat of the cop car during this whole time? Officer Rezac drove away shortly after with defendant in the car shortly after the counterfeit bill was discovered. And so he wasn't around anymore to give any advice or requests? Not, it was pretty quick after the officers found the $20 bill. After the $20, then they decided we better do a full inventory search or a community service search. I think that that was the intent at the beginning when they found the $20 currency. That was the intent for that part of the search was to do an inventory search to look for defendant's property. So they started with an inventory search. When did it convert to a community of safety search? So I don't know if I analyzed them as separate temporal, there's some sort of temporal guideline. The officers impounded the car under the community caretaking function, and that was for community safety. And then the inventory search, the purposes in that case were to protect the police from false claims, protect the police and the tow truck driver from anything dangerous in the car, and to protect defendant's property. So I don't necessarily split them into different analyses for purposes of the search. But I do think Judge Phillips, you mentioned once the gun holster was discovered, I think at that point, the officers certainly had reason to be concerned that there was a gun in the car, the fact that there was an empty holster sitting right there. But at that point, they have already removed the defendant, they knew it was going to get towed. So I'm having trouble which community you're trying to protect at this point. We know the car is going to be towed, the officers are going to be there until it is in fact towed and removed. So nobody, no kid's going to come around and say, hey, cool, let's open the car and see what we can find. So the community where the car is parked, seems to me is fully protected by the fact that it's going to be towed. When it is towed, it's going to be locked up in some concern. So I have difficulty knowing what community you're trying to protect, and why it needs protection. And then the third thing is, is the standard for search looser for community protection than for an inventory search. So again, Your Honor, I think that the community caretaking function was that analysis applies to why the car had to be off the road to begin with, why the officers had to make that decision to tow it was protect the community from defendants driving around unlicensed and without insurance. So that's the community protection aspect is the decision to end. So the search is not being supported, then, by community protection. The search is only an inventory search. Well, I think that once the officers found the gun, Your Honor, or the empty holster, I think that that certainly put them on notice that there could be a safety problem. No, but it said that, I thought you said the community function test was what drove the fact that you had to tow the car away. But now they've solved that we're going to tow the car, it's not going to be in this community anymore. And so after that, you are saying that it has to be an inventory search, I believe, because once it's locked up in an impoundment yard or on the tow truck, you're not worried about any community kids getting guns anymore at that point. So I think there are more latitude for a search under community protection than there is under inventory search. Your Honor, I haven't seen cases analyzing whether or not there's more latitude under one or the other. Perhaps there would be less latitude under community caretaking, as evidenced by the Lugo case, because the officers didn't testify about a particular concern behind the door panel. And that's why that search wasn't proper under community caretaking function. But I think that if you're analyzing separately the searches, or if you're analyzing the inventory search, first of all, the officers need to secure all the defendant's property, write down any valuable property, contraband valuables and a gun that's also on the policy. So they need to do that. But I guess I disagree that there's no safety issue after when the car is being towed away. There was testimony at the suppression hearing about how the tow truck driver has to get inside the car to pull the car up onto the ramp. So if there's a gun sitting around, I think that that could certainly be a danger. But that safety would be fully resolved by whether it's out on the seat or located close up, because you're not suspecting the tow truck driver as being complicit in a conspiracy who's going to grab something and shoot the officers. So all you're concerned about is if there's something so obvious, if it's resting on the accelerator pedal or something, but not it would give you no justification to try to look in compartments. Maybe, Your Honor, but again, this car was very messy. And so I think that it's very reasonable to think that items could be hid anywhere. But under the search was still appropriate constitutionally, because the officers were securing the defendant's property per their so that defendant couldn't later on make a false claim. Hey, you stole this from me. You stole that from me. This is an account. But that brings us back to then the inventory search. And my question then is just how broad the inventory search will allow you to go. Will it allow you to open cavities like under dashboards or false? I can see the false panel in the center console because you certainly can look in consoles and apparently you saw something at the bottom of the console that showed there was something underneath it. So that one's really not mysterious to me. But I must say I'm more concerned about whether a pure inventory search would allow you to try to open up under the glove compartment. And I mean, if the guy who said later, oh, I had some valuable money in there under the glove compartment and it got stolen. Do you think that the officers say we've got to protect against that false allegation by doing an inventory search? And if so, then an inventory search would let you really dismantle the entire car because we know drug people are pretty proficient about where they can hide drugs. I think the analysis in this regard, the officers testified at the suppression hearing that if the dashboard had looked normal, if it had looked untouched, they wouldn't have done that search. It was the fact that it had been tampered with and that they had been. It's the same thing in Lugo. The officers there saw a door panel that looked like it had been tampered with and we said, no deal. So I think that Lugo is distinct for a couple of reasons. First of all, the officers had no reason to be searching for anything in Lugo for a gun because that was the only thing that they were looking for and they had already found it. And also with regard to the inventory search, the opinion specifically states that on this record, this isn't a normal inventory search. I would argue that on this record in our case, it is because of the fact that the officer thought that a gun was nearby. The space looked like it had been tampered with. And so the district court properly concluded that it was basically a makeshift container. And the officers explained that if there's a place in the car that looks accessed or accessible, we'll go through that because that's where items can be stored. So I think those two things really differentiate this case. One other factual point I wanted to clarify for the record is that defendant doesn't challenge this factual finding by the court, whether or not defendant called his wife who had the insurance card or didn't have the insurance card. It's not shown on the dash cam video, but at the suppression hearing, that fact was elicited. And I think that it just further undermines the fact that there was no insurance here and little options and no good ones. All right. Thank you, counsel. Mr. Sian, you used up all your time, but I'll give you one minute for a battle and hold you to that one minute. Thank you, Your Honor. I just wanted to take my one minute to respond maybe a bit more succinctly to Judge Phillips's question at the outset of my statements with regard to whether there's a community caretaking role in searching for a gun once the holster is found because somebody walked by on the sidewalk, a kid perhaps might see the holster and try and get into the car to find the gun. I just was reviewing a quote from South Dakota v. Opperman that says, quote, an inventory search is a routine administrative procedure designed to affect three distinct purposes, protection of the owner's property, which might be stored in the vehicle, protection of the police against claims of lost, stolen or vandalized property, and protection of the police from potential danger. So I don't think that the hypothetical that you pose, while it's a legitimate concern, I don't think that that fits within the framework of Opperman and the framework of an inventory search. So I just wanted to take a moment to respond to that a bit more succinctly and more clearly. Thank you. Any questions from the panel? In that event, thank you both for your arguments and the cases submitted.